PETER L. ARIAN (Bar No. 238029)
(E-Mail: Peterarianlaw@gmail.com)
407 San Anselmo Avenue, Suite 201
San Anselmo, California 94960
Telephone: (415) 785-4060
Facsimile: (415) 329-1408

Attorneys for Defendant
ELVIN MEJIA PADILLA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-CR-367-13-CRB |
| Plaintiff, | |
| v. | **DEFENDANT ELVIN MEJIA PADILLA'S POSITION RE: SENTENCING** |
| ELVIN MEJIA PADILLA, | |
| Defendant. | |

On February 12, 2020, Defendant Elvin Mejia Padilla ("Mr. Mejia"), pled guilty to a single count of 21 U.S.C. § 843(b), Illegal Use of a Communication Facility. He now submits the following position re: sentencing.

Respectfully submitted,

DATED: March 6, 2020          By   */s/ Peter L. Arian*
                                     PETER L. ARIAN
                                     Attorney for ELVIN MEJIA PADILLA

**SENTENCING MEMORANDUM**

## I. INTRODUCTION

Mr. Mejia submits that a "time served" sentence in this case meets the statutory requirement of 18 U.S.C. § 3553(a), that the sentence is "sufficient, but not greater than necessary" to meet the ends of sentencing. While the government is recommending a sentence of "not less than 13 months and one day" (Dkt. Item 181, Govt. Sent. Memo at 1), Mr. Mejia submits that a time served sentence of almost 7 months[1] is sufficient here because:

- Contrary to the Government's sentencing memo, Mr. Mejia qualifies for a 4 level reduction for minimal role under U.S.S.G. § 3B1.2;
- Mr. Mejia grew up in abject poverty in Honduras;
- Mr. Mejia is of limited intellectual means and suffers from severe depression and drug addiction; and
- Mr. Mejia will be deported.

Mr. Mejia has submitted two exhibits with this sentencing memorandum: 1) A life history investigation; and 2) a preliminary psychological analysis. He submits that both exhibits support his requested sentence.

## II. MINIMAL ROLE (U.S.S.G. § 3B1.2)

The plea agreement fairly states Mr. Mejia's role in this case: "I was a street level dealer and usually obtained from my suppliers only enough drugs to re-sell over the next day or two." Dkt. Item 170, plea agreement at ¶ 2. The government takes the position that because Julio Cesar Viera Chirinos, was able to get a 4 level reduction as a minimal participant, this would exclude Mr. Mejia from the same reduction because of their relative conduct in the conspiracy. Dkt. Item 181, Govt. Sent. Memo at 3-4.

---

[1] The govt. accurately states that Mr. Mejia has been in custody since 8/14/19. Dkt. Item 150, Govt. Organizational Chart at 5.

Instead, the government argues that Mr. Mejia should receive a 2 level "minor participant" reduction. *Id.*

A review of the commentary listing the factors that the Court may considering in determining which mitigating role adjustment applies supports a 4 level reduction. *See* U.S.S.G. § 3B1.2, Application Note 3(C).

- *The degree to which the defendant understood the scope and structure of the criminal activity.* While defendants at the higher end of the conspiracy were trafficking in pounds contraband, worth thousands of dollars,[2] Mr. Mejia was a street-level dealer buying his drugs in 1/8 ounce portions for low quantities of money to get high and to sell so that he could buy more drugs. He had no knowledge of the structure, organization, or size of the conspiracy. He wasn't part of the conspiracy except as a street level buyer.

- *The degree to which the defendant participated in planning or organizing the criminal activity.* – Mr. Mejia had no planning and organization in the criminal activity.

- *The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority.* Mr. Mejia had none.

- *The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts.* Mr. Mejia bought drugs for personal use and to sell them to make money for his own drug habit. He had no responsibility or discretion in any upstream trafficking.

---

[2] *See* Dkt. Item 1, Complaint at ¶ 30, stating that officers found 1173.7 grams of methamphetamine, 718.6 grams of heroin, 467 grams of cocaine base, 168.9 grams of cocaine, and $73,118 in cash in a hidden compartment in an air compressor found in a residence associated with Eduardo Viera-Chirinos and Karen Castro.

DEFENDANT'S POSITION RE: SENTENCING

3

- *The degree to which the defendant stood to benefit from the criminal activity.* Mr. Mejia lived the life of a struggling addict, and gained little to no benefit from the criminal activity.

Of the 13 defendants charged in this case, Mr. Mejia submits that he is one of the least culpable defendants along with the three other co-defendants with whom he pleaded guilty: Gustavo Gamez Velasquez, Yordi Agurcia Galindo, and Rudis Valladeres-Caceres. The remainder of the defendants, per the government's calculations, are responsible for combined drugs weights ("CDW") **ranging from between three to over ten times** what is attributed to Mr. Mejia. *See* Dkt. Item 150, Govt. Org. Chart at 3-5 [listing 6546.46 kg of CDW for Eduardo Viera Chirinos and Karen Castro; 1798.02 kg of CDW for Alexander Gonzalez Vasquez, and 514.66 kg of CDW for Mr. Mejia]. As such, he submits that the 4 level reduction for minimal participant is warranted.

### III. SECTION 3553(A) FACTORS SUPPORT A VARIANCE IN THIS CASE

### A. History and Characteristics

Exhibits A and B, a social history and psychological evaluation of Mr. Mejia, respectively, provide a wealth of background information on his background and circumstances. He is the eleventh of eleven children born to his parents in rural Honduras. He was born into a home with dirt floors, no running water, and no electricity, where the family slept in two rooms. He had an abnormal premature birth, exhibited signs of cognitive impairment throughout his life, and sustained head trauma from bicycle accident at 18 years of age. He was reported to suffer headaches, loss of vision, and have memory loss. Ricardo Winkle, a defense retained psychologist, described Mr. Mejia as severely depressed and of limited intellectual means and poor

social skills.[3] He further described him as "passive, naïve, and highly dependent on others to manage his life."

Mr. Mejia reportedly breast feed until he was nine. He left school at eleven to work in the fields for less than $2 USD per day to support his family. Throughout his teen years he continued to suffer headaches. At some point, Mr. Mejia decided that the best thing for his family was to go to the United States to make more money. The trip to the U.S. was a nightmare of human trafficking ending in his walking through the desert thinking that he was going to die from thirst and starvation. After being saved from the desert Mr. Mejia lived in constant fear that he or his family would be harmed by the human traffickers who brought him to the U.S. He fell into a heavy pattern of drug use and addiction which led to the conduct in this case.

Mr. Mejia understands that he will be deported, and he wishes to return to Honduras. Mr. Mejia's mother is a diabetic in failing health whose leg was amputated, and he also has a wife and child in his old country.

**B.    A Longer Sentence Does Not Add to Deterrence in this Case**

In terms of individual deterrence or incapacitation, there is no argument that Mr. Mejia, a denizen of criminal history category I, needs to be separated from society to protect us from him. He is a non-violent man who fell into a spiral of addiction and drug related behavior which he horribly regrets, not a hardened criminal who needs to be caged to protect the rest of us.

Nor is there an argument that a longer sentence will deter future crime. Empirical evidence shows that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . .

---

[3] Due to the recent quarantine, Dr. Winkle was unable to perform a full battery of neuropsychological testing on Mr. Mejia.

were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism."  U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004).

## C.  The Effect of Collateral Consequences: Banishment by Deportation

Though Mr. Mejia wishes to return to Honduras, his impending deportation is still punishment because it will put him in a place that is devoid of economic opportunity. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 600 (1952) (Douglas, J., dissenting) ("Banishment is punishment in the practical sense. It may deprive a man and his family of all that makes life worthwhile."); *Barber v. Gonzales*, 347 U.S. 637, 642-43 (1954) (recognizing that deportation may be "the equivalent of banishment or exile") (*quoting Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948)).  In addition, because

of his immigration status, should he be sentenced to further imprisonment, Mr. Mejia is prohibited from participating in prison work programs, rehabilitative programs such as RDAP, or community placement for the last six months of his sentence, which would reduce the time he serves. *See United States v. Martinez-Ramos*, 184 F.3d 1055, 1058 (9th Cir. 1999).

## IV.  CONCLUSION

Elvin Mejia is a low-level drug dealer who has had a difficult life with little prospect of joy or success.  Were this a state court case he would receive probation.  He submits that his service of seven months in the Alameda County Jail at Santa Rita meets the statutory ends of punishment.  He submits that there is no good reason for further punishment in this case, and asks that the Court sentence him accordingly.

Respectfully submitted,


DATED: March 6, 2020          By  */s/ Peter L. Arian*
_____
PETER L. ARIAN
Attorney for ELVIN MEJIA PADILLA

# Exhibit A



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

February 26, 2020


Peter L. Arian
Attorney at Law
407 San Anselmo Avenue
Suite 201
San Anselmo, California 94960

Re: U.S. Mejia CR-19-367CRB-13

Dear Mr. Arian:

You requested I contact the client's family through the client's brother Ismael Mejia at (415) 879-4381to obtain information about the client's life history for mitigation purposes.

The following family members were interviewed:

1) **Ismael Mejia-Padilla**, client's brother was interviewed by telephone on 2/18/20
2) **Juana Maria Padilla**, client's mother was interviewed by WhatsApp video 2/22/20
3) **Keyti Daniela Aguilar**, client's wife was interviewed by WhatsApp video 2/22/20

## <u>OVERVIEW OF THE CLIENT'S LIFE:</u>

In interviewing the client's brother, Ismael Mejia I learned introductory information about the client's life. The client grew up in a very large family and the family was raised poor. The client was born outside of Tegucigalpa, Honduras in a very small village where everyone including the client had very little education.

The client experienced some health setbacks as he was born premature and was in a bicycle accident at 18 years-old. The clients sustained severe head trauma and his leg was fractured in multiple areas. This is why the client limps and has suffers a lifetime of migraine headaches.

Like all immigrants that come from Honduras, they come to the U.S. to live a better life. The situation in Honduras is devastating for many and this is one of the reason's the client came to the U.S.



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

## THE CLIENT'S SIBLINGS:

The client had ten siblings and he was the eleventh in line.

1) Vilma de Jesus Mejia, 47 years old lives in Honduras
2) Mariana Esmeralda Mejia, 46 years old lives in Spain
3) Ismael Mejia Padilla, 44 years old lives in Oakland, CA
4) Ana Maria Mejia, 42 years old lives in Honduras
5) Juana Sonilda Mejia, 40 years old lives in Spain
6) Jorge Mejia, 38 years old lives in Jersey City, New Jersey
7) Norma Mejia 37 years old, lives in Honduras
8) Dona Maribel Mejia 35 years old, lives in Spain
9) Besis Sulema Mejia 34 years old, lives in Honduras
10) Marlon Joel Mejia 33 years old, lives in Honduras
11) The client, DOB 3/29/88, 32 years old

## INTERVIEW OF ISMAEL MEJIA-PADILLA:

ISMAEL MEJIA PADILLA
3060 International Boulevard, # 2
Oakland, California 94601
Tel: (415) 879-4381

## THE CLIENT'S LIFE IN HONDURAS:

**Home**

The client was born on March 29, 1980 in Orica Francisco, Murason Honduras. The client was raised poor and was the 11th child. The client lived in a two room and kitchen area adobe house with a dirt floor. When the client was a child the house did not have any electricity and the entire family slept in the two rooms. The house had electricity when the client was 15 years old. Mr. Mejia said that they got water from the river to drink, bathe and to wash clothes.

**Birth**

The client was born premature was placed in an incubator as an infant. Mr. Mejia did not know for how long his brother was in an incubator, but Mr. Mejia believes that the client developed headaches due to this.



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

According to Ms. Padilla, the client's mother the client was born at home and he was born early at 7 months. The client was born at home with a midwife because the family did not have money for prenatal and medical care.

Ms. Padilla said the client almost died during birth. Ms. Padilla had to be taken to the emergency hospital and the client was left in the hospital for two months in an incubator.

## SCHOOLING AND WORK:

Mr. Mejia is under the impression that his brother, the client went to 6th grade in school. The client attended school until age 11. The client worked in the fields growing and harvesting beans and corn from age 13-24. The client earned very little money. He earned about 50 Lempira which is less than $2.00 USD per day.

The client and his siblings were expected to work as children so they could help the family bring in money to survive. Everyone had to work growing and harvesting corn and beans. This type of work was mostly available to those who lived in the area. Everyone engaged in this type of work to survive where they lived. The mother stated that sometimes they did not earn enough money to feed food for everyone in the family. Most of the children did not have any shoes and lived walking barefoot.

Ms. Padilla, the client's mother provided the same information as Mr. Mejia. Ms. Padilla seems to recall that the client was a good student.

The women in the family Ms. Padilla and the sisters would wash clothes in the river for money and the males worked growing corn and beans. All of Ms. Padilla's children only attended school until 6th grade and then went out to work.

## BICYCLE ACCIDENT AND HEADACHES:

The client developed migraine headaches at age 7 and at some point experienced loss of vision, according to Mr. Mejia, the client's brother. Mr. Mejia said his mother would have more information about the client's health as far as medical treatment.

The client was in bicycle accident at age 18. He sustained severe head trauma and fractured his left leg. The accident was very severe because the client lost consciousness. The client was hospitalized and it took him 6 months to recover. This is why the client walks with a permanent limp.

Mr. Mejia recalls thereafter his brother became very forgetful. The client appeared distracted often and would he would forget where he was going to go. The client would go to the store to



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

buy something specific and he would come home with something totally different. There were times that when the client would get to the store and the client could not remember what he was supposed to buy.

Ms. Padilla recalled that the client started having severe headaches as early as 2-years-old. The client would cry a lot and hold his head saying that his head hurt. The client continued experiencing headaches through adulthood. The client would sometimes stay home and not go to school or work.

The client's headaches were very severe and Ms. Padilla recalls that the client almost lost his vision at age 15. This episode lasted only for a few days and the client was taken to a city  in Tegucigalpa, Honduras to see a doctor. Ms. Padilla did not recall what was the diagnosis because she did not have money to pay for the exams. Ms. Padilla treated the client with Manzanilla tea. Whatever the client experience it went away, but the headaches continued.

Ms. Aguilar, the client's wife met the client and he already suffered from migraine headaches. When she first met the client, the client would get migraine headaches if he drank alcohol. The headaches were more severe. The client would get these headaches even when he stopped drinking.

There were times when the client would not be able to go to work or go out of the house and would stay in bed due to the migraine headaches. The client has never taken any medicine for the migraine headaches because he did not have access to medical care unless it was an emergency.

## ALCOHOL AND DRUGS:

The client started using alcohol at age 17 when he would socialize with friends outside of the home. Mr. Mejia believed that the client also used cocaine, but Mr. Mejia never saw the client use cocaine.

The client's father was known to drink and had problems with alcoholism. Their father was not the type of person that would get violent he only struggled with drinking alcohol. When the client is drunk he acts in the same manner as the father.

The client would lose conscienceless when he drank alcohol too much. The client will not recall what happened the prior day when he becomes sober. The client had difficulty knowing when to stop drinking alcohol and most of the time he will pass out. The client mostly talked too much when he is under the influence of alcohol and he would repeat himself a lot.

Mejia made it clear that their father and the client are not the violent types and will not hit anyone when they are drunk.



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

Ms. Padilla, the client's mother stated that the client started drinking alcohol at age 17 with friends and sometimes the client would not come home for three days. This worried Ms. Padilla because there were and still are gangs and unsavory people that had ill intentions on the streets of Honduras.

Ms. Padilla often worried about the client when he would not come home. The family would spend time looking for the client. Once the client was found, the client appeared disoriented and would say that he did not know where he was or what he did. It got to the point that Ms. Padilla felt safer if the client would be tied up with a rope at home so that he would not leave the house.

Ms. Padilla never saw the client take any coke and believes that the client only drank alcohol. The client stopped drinking alcohol after he married Ms. Aguilar because Ms. Aguilar was a good influence in the client's life. Ms. Aguilar went to church and the client got involved in that. The client seemed much happier when he did this instead of being out with friends drinking.

## MARRIAGE:

Keyti Daniela Aguilar and the client met in 2009 nearby Orica, Honduras. Ms. Aguilar was 13 years old and the client was 21 year-old. They met in the street when the client was socializing with friends. They dated until 2012 when they decided to get married. The couple did not have any economic means to have a lavish wedding or ceremony. They moved together and the couple moved into the client's parent's home. By this time many of the other siblings had moved out of the house.

The couple only had one son named Cristopher Daniel Mejia-Aguilar who is 6 years-old. Ms. Padilla knows of two other children the client had out of wedlock, but Ms. Padilla does not keep in touch with those children or the mother.

Ms. Aguilar, the client's wife was a very good influence on the client because the client stopped using drugs and alcohol when he married her. Ms. Aguilar is a very spiritual person and would attend church services. The client stated going to services with Ms. Aguilar.

Ms. Aguilar is still in a relationship with the client even though they do not live together in the same country. It is difficult living separately, but at this time it is the only option they have due to financial reason.

## HUMAN TRAFFICKING BY COYOTES:

The client left Honduras to go to the US in 2014 to seek a better life for himself and to help send money back home. Most of the siblings that had left to the US such as Mr. Mejia and his two



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

sisters that live in Spain have left Honduras because of the poverty they experienced. In Honduras they never were able to work enough to overcome poverty.

The only viable way to find work is to leave Honduras and move to the US. The client had to pay half the money to coyotes and then pay the rest once he landed in the US. A trip to the US cost $7000.00. It is believed that the client had already paid half of the money when he left Honduras.

Mr. Mejia was unclear what happened to the client on the way to the US, but Mr. Mejia had not heard from the client for a very long time. Mr. Mejia kept receiving phone calls from the Coyotes telling Mr. Mejia that they needed more money before they reached the US; however, when Mr. Mejia would ask the Coyotes to put the client on the phone the Coyotes would hang up. Mr. Mejia did not want to pay money knowing that the client was already dead or nowhere to be found.

Later the client divulged to Mr. Mejia that the client, three women and two men were left behind in the desert with very little water and peanuts. Mr. Mejia believed that this was because the client had problems not paying the rest of the money to get him to the US.

Some rancher that was overlooking his deer in his ranch and found the client almost dead. The rancher was Hispanic and picked up the client placed him in his trailer and took the client home. The client was very ill, almost non-responsive and the rancher helped the client get back to health. The rancher took the client to a medical facility. The rancher helped the client for 15 days and helped the client get in contact with his family in New Orleans.

Family in the US helped pitch in to get the client to New Orleans. Mr. Mejia figured a way to get someone in San Antonio, Texas get the client to New Orleans, Louisiana. Mr. Mejia and his family in Honduras and in Spain were very concern because they had not heard from the client for two weeks and they thought that the client had died. It is a blessing that the client did not die in that trip.

Ms. Padilla, the client's mother knew limited information about the client's crossing to the US. She only knew that the client was missing for a few weeks, but it seem an eternity to her. She thought that the client was left to die in the desert. She had no idea where he was because she had not heard from him once he left the US.

Ms. Padilla knows that the client was found almost dead in the desert by a rancher in Arizona. She did not know the details as to who cross the client over to the US or how much money the client paid the coyotes. Ms. Padilla did not know the details of this awful event, but she is very happy her son is alive doing well.



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

## WORK IN THE US:

The client immediately found work with a brother that lives in New Orleans. The client worked putting up sheet rock. The client moved to New Jersey  2015 with another brother, and then moved to the Oakland, California  2017 where he continued working in construction installing sheet rock.

## INTERVIEW OF JUANA MARIA PADILLA:

Juana Maria Padilla, age 67
Client's Mother
DOB 11/1/1952
Orica Francisco Morzan, Honduras



Juana Maria Padilla photograph provided by client's wife Keydi Daniela Aguilar.

I spoke with the client's mother Ms. Padilla on Saturday, February 22, 2020, at 9:50 a.m. I spoke with her via WhatsApp video. I introduced myself as the investigator working in the case. Ms. Padilla is a Spanish speaker and that is the only language she speaks.

Ms. Padilla is a very sweet 67-year-old elderly woman. Her birthday is November 1, 1952. When I spoke with her she was unable to tell me how she was and told me that she was 62 years-old and that she had been married for 60 years. I told her wow you must be the youngest bride I have ever met. I told her that she would have been 2-years-old when she married her husband. She



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

started laughing and said, "Oh, I really don't know how old I am you would have to ask someone else." I told her that no worries and I understood she must be a little nervous. Ms. Padilla's daughter-in-law and the client's wife, Keydi Daniela Aguilar provided me with the correct age and date of birth.

**PARENTS:**



Juana Maria Padilla and Santos de Jesus Mejia, the client's parents

The client's mother, Ms. Padilla met her husband Santos de Jesus Mejia when she was 16 years-old and Mr. Mejia was 22 years-old. They met in Morazan Guayate, Honduras. The husband Santos de Jesus Mejia is 73-year-old and his date of birth is January 22, 1947. They had 11 children.



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

The couple lived in a small village that has a population of approximately 4000. They lived in a two room house that had a kitchen, and living area. The house was constructed of adobe and the home had a dirt floor. The couple only had one bed and only four people could sleep in the bed at a time. The rest would sleep on the floor with blankets. The house had electricity when the client turned 15 years-old. They did not have running water and the family would go to the river and carry water in a bucket and carry the bucket on top of their heads to transport it. They would use the water to cook and drink. The family would bathe and wash clothes in the river.

The couple did not have any education and they raised their family by working in growing and harvesting beans and corn. They earned very little money to feed their children. Mr. Mejia would earn anywhere between 60 to 120 Lempira which is not very much money. 120 Lempira is $ 4.87 USD. Ms. Padilla mentioned that sometimes there was very little food to eat. Their main source of food was beans, corn and eggs.

Most of her children did not own any shoes and they walked barefoot. Sometimes neighbors who had extra clothing or shoes would help Ms. Padilla by giving her clothes or used shoes for her children.

## MOTHER'S AND FATHER'S HEALTH:

### Juana Maria Padilla, Mother

According to Ms. Padilla she had diabetes and lost her leg last year. She had very little access to medical treatment and medication. Ms. Padilla was unable to clearly articulate how she came to have her leg amputated. I spoke with the daughter-in-law, Keyti Daniela Aguilar to answer some of these questions.

Ms. Aguilar explained that the Ms. Padilla has had diabetes for a long time and Ms. Padilla did not have access to medical care. It is unclear when Ms. Padilla developed diabetes. Ms. Padilla had gone to see a doctor prior getting her leg amputated. Ms. Padilla went to the capital city, Tegucigalpa, which is five hours away by bus. It all seemed well and she never was diagnosed with diabetes or if she did Ms. Padilla was never given any medication to treat it.

Last year Ms. Padilla had an accident where a wooden pole fell on her left leg. She developed a cyst and that cyst grew and started hurting her leg. Ms. Padilla was in excruciating pain. Ms. Padilla had to be taken to the capital to see a doctor. She was hospitalized and told that she had gangrene and that her leg needed to get amputated or she would die.



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

Ms. Padilla did not have access to medical care up to this point and she does not have medical insurance. Ms. Padilla wasn't taking any diabetic medicine. Now that her leg has been amputated, Ms. Padilla does take medicine and goes to the doctor every three months.
The two daughters that live in Spain send money to Ms. Padilla so she can go see the doctor every few months and get her medicine.

**Santos de Jesus Mejia, Father**

Ms. Aguilar is the primary caregiver for both parents. Ms. Aguilar moved into the parent's house to care for them.

Mr. Mejia mostly complains of aches and pains in the joints, but he has never been diagnosed with any arthritis or rheumatism. Mr. Mejia is 73-years-old. Mr. Mejia does not take any medication and he does not see any doctors. Mr. Mejia also does not have any access to medical care. Mr. Mejia no longer works and only goes to the center of town to buy wood for wood fire for the stove.

Ms. Aguilar lives with the client's parents which is the same home where the client grew up in. When the client lived in the house, the house had only two rooms, one kitchen and living area. The house did not have any running water or electricity. The house now has running water, electricity and has a cement floor. In the past the house had a dirt floor. Only the client's parents, Ms. Aguilar and her son live in the home.

## PROBLEMS WITH GANGS:

The client's father at one point had saved money to buy a few farm animals to help feed the family. They had some cows and this is how they were able to have milk, plus their main source of food was corn and bean.

In 2014, local gangs came to the parent's home and stole what little they had and stole their cows. This was very devastating for the father and he was very distraught by this. The parents reached out to everyone who lived in the US to tell them about what had happened. Everyone that lived in the US and in Spain collected money to help the parents replace their cows.

The gang problem in Honduras is very serious and it is very difficult for those who are left behind. These gang members come into small towns from the city to harass people such has the client's parents and family who are already struggling financially.

## INTERVIEW OF KEYTI DANIELA AGUILAR:

Keydi Daniela Aguilar, the client's wife



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

DOB: 12/28/1997, 23-years-old



Keyti Daniela Aguilar, Client's wife



Cristopher Daniel Mejia-Aguilar, Client's son 6-years-old

Cristopher Daniel Mejia-Aguilar, DOB 2/1/2014, age 6



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

The couple had one son Cristopher Daniel Mejia-Aguilar. He is 6-years-old. Ms. Aguilar knows that the client had two other children by another woman, but these children were born before Cristopher. She knows very little about the children and wasn't certain of their names. One child is named Catherine and the other child is named Yornele or something like that. Ms. Aguilar knows that the only reason that the client does not have contact with the children is because the mother has some mental health issues.

When Ms. Aguilar met the client, the client had a drinking problem and he was socializing with friends that were poor influence. Over time the client distance himself from these friends mostly because he had to become responsible as parent and husband.

The client continued to work in agriculture working growing crops such a beans and corn. The client also worked as construction worker, but the client did not earn enough money in Honduras. He would earn 150 Lempira which is equal to .40 US cent per day. The client left to the US to help his family with money.

## CAREGIVER FOR PARENTS:

Ms. Aguilar is a homemaker primarily because she is the person that cares for her in-laws. The elderly couple need help because the mother, Ms. Padilla now has her leg amputated. The father, Mr. Mejia is not doing well as he suffers from joint pain. Ms. Aguilar is the person that cares for her son and the in-law. She washes clothes, cleans the house and makes the meals for the family.

Ms. Aguilar lives in an area that has very little access to healthcare and good nutrition. Their diet consist mostly of beans and corn. They really don't eat fruits or vegetable because you would have to travel to the city which is five hours away. From time to time, Ms. Aguilar will grow mangos and oranges, but they only get these fruits if it rains. It has not rained lately.



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com

## PHOTOGRAPHS OF THE HOME:



The client's mother, Juana Maria Padilla sitting outside the home.



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com



The front part of the house.



369-B Third Street, # 376
San Rafael, CA 94901
Call: (415) 290-8105
Fax: (650) 257-5099
Alexvera64@gmail.com
www.VeraInvestigations.com



A side view of the house.

*********

This concludes the investigation.

Sincerely,
Alejandra Vera-Vischer
Alejandra Vera-Vischer
PI License # 22612
Private Investigator
Vera Investigations

# Exhibit B

### Ricardo Winkel, Ph.D.

*Clinical Psychology • Forensic Psychology • Neuropsychology*

One Sansome Street, Suite 3500
San Francisco, CA 94104
415.399.1194

5625 College Avenue, Suite 211
Oakland, CA 94618
510.559.9354

ricardowinkel@winkelpsychological.com

March 6, 2020

Re: *U.S. v. Elvin Mejia Padilla*

CR-19-367CRB-13

### Preliminary Psychological Evaluation Report

Defendant's Name: **Elvin Mejia Padilla**

Date of Birth: 03/29/1988 (30)

Evaluation Dates: 02/04/2020, 02/26/2020

### INTRODUCTION

I, the undersigned, conducted Mr. Mejia Padilla's psychological evaluation at Contra Costa County's Santa Rita Jail. Peter Arian, Esq. represented to me that his client, Mr. Mejia Padilla, was convicted of possession with intent to sell and conspiracy to distribute controlled substances and asked me to prepare this preliminary report for sentencing mitigation purposes. At his request, I may issue a more extensive one at a later date.

Mr. Mejia Padilla's defense attorney agreed with my condition that I would evaluate his client with no particular outcome in mind, that I would exercise independent professional judgment in all aspects of the evaluation, and that the payment of fees for my work would not be contingent on the contents of this report or any particular finding or recommendation on the matters being considered herein.

I explained to Mr. Mejia Padilla the purpose of the evaluation and the procedures involved and advised him on the issues of limited confidentiality and the potential uses of the information obtained during his evaluation. I explicitly alerted him that the results of his evaluation may or may not help his defense and that I intended to share my findings with his attorney, who may disclose them to the District Attorney and others involved in his case. I also informed him that since my role was limited to that of an objective, impartial evaluator, I would not be in a position to provide him with any form of treatment during or after his evaluation. Moreover, I told Mr. Mejia Padilla that if he had any doubts or misgivings about the evaluation, he could and should discuss those with his attorney before agreeing to proceed with it. I further indicated to him that as far as I was concerned, he was under no obligation to submit to my evaluation and that he was free to stop it at any time and that if he chose to do so, I would note his decision in my records and apprise his attorney but not rely on it to formulate an opinion about him.

With Mr. Mejia Padilla's verbally stated understanding and assent, I proceeded to examine him.

**SOURCES OF INFORMATION**

*Except for my observations and conclusions and Mr. Mejia Padilla's psychological test results, facts and events mentioned in this report are presented as he described them or as stated in his records.*

**1. Clinical-Diagnostic Interview**

Mr. Mejia Padilla's mother tongue is Spanish and his proficiency in English is minimal. Since I am fully fluent in Spanish, I evaluated him in his native language without the assistance of interpreters.

**2. Records**

I received from defense counsel the records listed below, which I reviewed but did not summarize in this report.

- DEA Complaint
- U.S. Attorney's Indictment
- Vera Investigations Report

**3. Psychological Testing**

I administered Mejia Padilla the Spanish-language versions of tests listed below. His results are explained in the Test Results section.

Personality Functioning:

• Millon's Multiaxial Clinical Inventory, 4th Edition (MCMI-IV)

Post-Traumatic Stress Disorder

• Trauma Symptom Inventory (TSI)

Validity:

• Structured Interview for Reported Symptoms, 2nd Edition (SIRS-2); MCMI-IV Validity Scales

**BACKGROUND**

Mr. Mejia Padilla is a thirty-year-old married Hispanic man. He is was born and raised in a rural area in Honduras, in a large family of very humble means. His mother breastfed him until he turned nine. He lived with his parents and siblings in a one-room house without power and running water. When he was still a child, he fell off a bicycle and sustained a head injury, which resulted in or aggravated already existing cognitive difficulties. He struggled academically and quit school after completing 6th grade and went to work in the fields with his father and brothers. His wife and their son live in Honduras.

His family was extremely poor and grew vegetables in a small parcel of land for their own consumption. He endured severe hardship in his early years and decided to come to the U.S. to help support his parents, wife, and son. On his way through Mexico, he was kidnapped by gang members, who physically assaulted him and threatened to kill him. They held him hostage and released him only after his relatives paid ransom. He crossed the border without adequate gear, run out of food and water, and wandered in the desert until a local rancher accidentally found him severely dehydrated, starved, and semiconscious. He then connected with relatives and acquaintances that sheltered him and helped him find employment.

He had occasionally used drugs in Honduras but after getting married, he became religious, joined his wife's congregation, and stopped. However, he felt lonely and became depressed in this country and relapsed. Someone he had befriended in New York and shared drugs with him came to California, invited him to come to the Bay Area, and told him that he could get him a job. Only after his arrival did he realize that his acquaintance had misled him and intended to recruit him into his drug dealing business.

Mr. Mejia Padilla felt beholden to his acquaintance because he had no income, was intermittently homeless and continued to get drugs from him. Since his arrest, he has been in institutional remission.

**SUMMARY OF FINDINGS**

Mr. Mejia was alert and oriented. He appeared to be of below-average intelligence, which was consistent with his reported background and limited exposure to formal education. Nevertheless, he understood questions, was able to follow instructions and could articulate his thoughts clearly. He did not display any signs of thought, perceptual, or mood disorders. He broke down and cried

and stated that he missed his mother. His mood was markedly depressed but he explicitly denied harboring any urges to harm himself or others.

His test results were valid. They were consistent with his clinical presentation and suggested the presence of severe depression, post-traumatic symptoms and a history of substance abuse in a highly passive and dependent personality. There was no indication that he possesses the attitudes and behavioral dispositions that are commonly found in individuals with antisocial and psychopathic personalities, such as difficulties with anger, sadism, and callous disregard for the feelings and needs of others. If anything, he appears to be a meek and eager to please individual.

**Conclusions**

Mr. Mejia Padilla is a psychologically immature person with limited intellectual means and poor social skills. He is passive, naive, and highly dependent on others to manage his life. He developed a reliance on drugs to relieve his longstanding depression, which is consistent with his prominent passive-dependent personality traits.

Based on the information I had the opportunity to review, it is my opinion that Mr. Mejia Padilla's passivity, submissiveness, lack of independent initiative, and substance abuse problem rendered him vulnerable to being manipulated and exploited by his associates.

End of Report

Respectfully Submitted,

*Ricardo Winkel, Ph.D.*

Ricardo Winkel, Ph.D.